AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| TEIHOTU TE MATA ONEVANEVA AUGUSTE TERAIHAROA, and PIERRE BURNS, | Case No.   2:24-mj-00631-DUTY |
| Defendants. | |

FILED
CLERK, U.S. DISTRICT COURT

Feb. 3, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ts___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 1, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Andrew Cox, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   February 3, 2024

City and state:   Los Angeles, California

_____
*Judge's signature*

Hon. Stephanie Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Colin S. Scott x3159

## <u>AFFIDAVIT</u>

I, Andrew Cox, being duly sworn, declare and state as follows:

### I.   <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against Teihotu Te Mata Onevaneva Auguste TERAIHAROA ("TERAIHAROA") and Pierre BURNS ("BURNS"), for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), seized during the arrest of TERAIHAROA and BURNS on February 2, 2024, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in Attachment A:

a.   One purple Samsung, IMEI: 350957914045684, seized from TERAIHAROA's person ("SUBJECT DEVICE 1");

b.   One white Samsung, IMEI: 353220823510992, seized from BURNS's person ("SUBJECT DEVICE 2"); and

c.   One black Samsung, IMEI: 354890387738954, seized from BURNS's person ("SUBJECT DEVICE 3").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF AFFIANT

5.    I am a Special Agent with Homeland Security Investigations ("HSI"), currently assigned to the Office of the Assistant Special Agent in Charge Los Angeles International Airport ("LAX").

6.    My formal narcotics training began in 2010 at the Air Force Security Forces/Police Academy, where I received instruction in narcotics identification and related drug laws. I have a B.A. in Organizational Leadership from Arizona State University and an A.A.S. in Criminal Justice. I have attended the Federal Law Enforcement Training Centers Criminal Investigations Training Program and HSI Special Agent Training Program. During this instruction, I had an opportunity to learn how to conduct narcotics investigations and view packaging techniques used for street and major-level drug sales and smuggling operations.

7.    I have participated in a variety of narcotics investigations ranging in complexity from simple possession to complex conspiracies. I have arrested and interviewed subjects, executed search warrants, conducted physical surveillances, utilized electronic and video surveillance, spoken to informants, suspects, and other experienced narcotics investigators concerning the methods and practices utilized by narcotics traffickers.

8.    I have participated in numerous narcotics investigations. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I am familiar with the methods of operation that narcotics traffickers utilize, including the distribution, storage, and transportation of narcotics and the collection of narcotic related proceeds from drug trafficking and various methods of money laundering used to conceal the nature of the proceeds. Additionally, I have participated in many aspects of drug investigations alongside experienced senior agents and task force officers.

9.    Based on my training and experience, I am familiar with the methods of operation used for the distribution, storage and transportation of controlled substances, as well as the collection of proceeds of drug and firearm trafficking and methods of money laundering used to conceal the nature of the proceeds.

III. **SUMMARY OF PROBABLE CAUSE**

10.  On February 1, 2024, TERAIHAROA and BURNS attempted to travel from LAX to Tahiti International Airport via Air Tahiti on flight AF 76, which was scheduled to depart at approximately 11:50 p.m.

11.  Customs and Border Protection ("CBP") Officers conducted a secondary inspection of TERAIHAROA and BURNS after they arrived at the boarding gate due to the quick turnaround nature of their trip and the recent influx of outbound narcotics destined from LAX to Tahiti.

12.  CBP searched the bags of TERAIHAROA and discovered a Pop Chips bag concealing seven plastic wrapped bags containing a crystalline substance that later field tested positive for methamphetamine. The crystalline substance weighed a total of approximately 313 grams.

13.  During a recorded and Mirandized interview, TERAIHAROA told law enforcement that the bag was his and that he packed the bags himself. TERAIHAROA also told law enforcement that he had agreed to smuggle drugs for BURNS before departing Tahiti in exchange for $1,500 U.S. currency and $5 million French Polynesian Francs upon his return.

14.  CBP searched the bags of BURNS and discovered a Pop Chips bag concealing five plastic wrapped bags containing a crystalline substance that later field tested positive for methamphetamine. Additionally, CBP discovered two more plastic wrapped bags in the hardshell lining of BURNS's luggage containing a crystalline substance that later field tested

positive for the methamphetamine. The crystalline substances in BURNS's bags weighed a total of approximately 550 grams.

15.   BURNS told law enforcement that the bags in his possession were his and that someone else had packed his bag. The bag also contained various clothes that were consistent with BURNS's body size and shape.

### IV. STATEMENT OF PROBABLE CAUSE

16.   Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I know the following facts:

**A.    TERAIHAROA and BURNS Attempt to Smuggle Methamphetamine On Board a Flight to Tahiti**

17.   I know from reviewing law enforcement reports that on February 1, 2024, CBP Officers ("CBPOs") conducting passenger analysis for suspicious travel patterns at Tom Bradley International Terminal identified TERAIHAROA and BURNS as meeting certain suspicious flight patterns. TERAIHAROA and BURNS, who are residents of French Polynesia, were scheduled to depart LAX on Air France flight AF 76 to Tahiti International Airport at 11:50 p.m on Thursday, February 1, 2024.

18.   TERAIHAROA's and BURNS's travel pattern was identified as suspicious because they had paid for their tickets in cash and had booked their return flights within three days of having first arrived in the United States. Based on my training and experience, I know that this pattern is indicative of drug trafficking.

19.   I know from reviewing law enforcement reports, that based on these characteristics, CBP determined they would conduct an inspection of TERAIHAROA and BURNS prior to their departure for Tahiti.

20.   According to law enforcement reports, at approximately 11:00 p.m. on February 1, 2024, CBPOs encountered TERAIHAROA and BURNS at Gate 208 in the Tom Bradley International Terminal and began inspecting their documents and luggage. At approximately 11:15 p.m., CBPOs inspecting TERAIHAROA's carry-on luggage discovered a Pop Chips bag with seven clear vacuum sealed bags containing a white crystalline substance which I have pictured below.

  

21.   At or around the same time, CBPOs searched BURNS's carry-on luggage and discovered an identical style Pop Chips bag containing approximately five clear vacuum sealed bags, pictured below, containing a white crystalline substance. Additionally, CBPOs discovered two more clear vacuum sealed bags

//

//

containing a white crystalline substance in the plastic framing of the luggage also pictured below.

  

22.  I know from talking with other law enforcement agents that CBPOs continued to search the luggage and discovered the SUBJECT DEVICES but did not discover any other contraband. TERAIHAROA was in possession of SUBJECT DEVICE 1 and BURNS was in possession of SUBJECT DEVICE 2 and SUBJECT DEVICE 3. At approximately 12:24 a.m. on February 2, 2024, TERAIHAROA and BURNS were escorted back to the main inspection area of the Tom Bradley International Terminal.

23.  At approximately 1:36 a.m., CBPOs contacted me and reported that the white crystalline substances contained in all TERAIHAROA's and BURNS's luggage had tested positive for the presence of methamphetamine using a Gemini Narcotics Analyzer. The total approximate weight of the methamphetamine located in TERAIHAROA's luggage was 313 grams. The total approximate weight of the methamphetamine located in BURNS's luggage was 550 grams. Based on my training and experience, these are both quantities of methamphetamine consistent with distribution, not mere personal use.

**B.    Interviews of TERAIHAROA and BURNS**

24.    I know from reviewing law enforcement reports that at approximately 10:00 a.m. on February 2, 2024, HSI Special Agent Paul Welch and Omar Yasin with the assistance of a French interpreter interviewed TERAIHAROA. The following is a summary of the interview and does not purport to set forth all facts or knowledge involved in the interview:

a.    At approximately 10:10 a.m., TERAIHAROA was presented a Miranda Rights Waiver form which was translated into French by the interpreter. TERAIHAROA waived his rights and began to speak with HSI regarding the methamphetamine located in his carry-on luggage.

b.    TERAIHAROA told law enforcement that he was in Los Angeles with BURNS. TERAIHAROA explained that he had stayed with BURNS in a hotel approximately 15 minutes away from LAX. BURNS had asked TERAIHAROA to carry drugs in his luggage prior to departing the hotel for LAX but TERAIHAROA declined. TERAIHAROA said that when they arrived at the airport at approximately 8:00 p.m. on February 1, 2024, BURNS forced TERAIHAROA to take some of the drugs in his carry-on luggage.

c.    TERAIHAROA stated that the luggage with his name tags were indeed his luggage including the luggage containing approximately 313 grams of methamphetamine.

d.    TERAIHAROA first stated he was forced by BURNS to bring the drugs, but later changed his story. Eventually, TERAIHAROA said that a childhood friend named THOMA and BURNS approached TERAIHAROA while in Tahiti, French Polynesia, and

asked TERAIHAROA to fly to the United States with BURNS and return with drugs.

e.    TERAIHAROA stated that THOMA and BURNS had promised to pay for the flight, hotel, and give him $1,500 in spending money for the trip.

f.    TERAIHAROA said he was also promised $5,000,000 French Polynesian Francs, which according to my review of Xe.com, a currency converter website, is the equivalent of approximately $45,240 U.S. currency. TERAIHAROA stated the BURNS paid for their hotel with cash and that they stayed in the same room.

25.  I know from discussions with other law enforcement officers that at approximately 11:00 a.m. on February 2, 2024, HSI Special Agent Paul Welch, Omar Yasin, and HSI TFO Daniel Dang with the assistance of a French interpreter interviewed BURNS. The following is a summary of the interview and does not purport to set forth all facts or knowledge involved in the interview:

a.    At approximately 11:05 a.m., BURNS was presented with a Miranda Rights Waiver form which was translated into French by the interpreter. BURNS waived his rights and began to speak with HSI regarding the methamphetamine located in his carry-on luggage.

b.    BURNS said that he traveled to Los Angeles to see some sites and return to Tahiti. BURNS stated that he stayed alone in his hotel room and came to the United States alone.

c.    BURNS said that prior to his departure flight, he went to a restaurant across the street from his hotel and had

left his luggage unpacked. BURNS told law enforcement that upon his return he found his luggage packed and did not think to check it because he was in a rush to get to LAX.

      d.    BURNS claimed ownership of his luggage which concealed approximately 550 grams of methamphetamine.

      e.    I know from talking to other law enforcement officers that at approximately 11:20 a.m., HSI concluded the interview of BURNS due to receiving repeatedly vague answers about the nature of his trip and the methamphetamine found in his luggage.

      f.    HSI took custody of the methamphetamine, luggage, and SUBJECT DEVICES. HSI then verified the field-test conducted by CBP of the crystalline substance that was in TERAIHAROA and BURNS luggage using the ThermoFisher Gemini, which I understand to be a tool law enforcement uses to field-test suspected drugs. The test indicated that the substance was positive for methamphetamine. The total weight of the seven clear vacuum sealed bags found in TERAIHAROA's luggage was approximately 313 grams. The total weight of the 9 clear vacuum sealed bags found in BURNS's luggage was approximately 550 grams.

## V.    TRAINING AND EXPERIENCE ON DRUG OFFENSES

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

      a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of

11

meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

 e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

  VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

27. As used herein, the term "digital device" includes the SUBJECT DEVICES.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

 a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

    b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

    c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

    d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

31.   For all the reasons described above, there is probable cause to believe that TERAIHAROA and BURNS have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause to believe that the items to be seized described in Attachment B

will be found in a search of the SUBJECT DEVICES described in

Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
February, 2024.

_____
HONORABLE STEPHANIE CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

1.    The following digital devices (the "SUBJECT DEVICES"),
seized during the arrest of TERAIHAROA and BURNS on or about
February 2, 2024, and held in the custody of Homeland Security
Investigations ("HSI"), in El Segundo, California:

        a.    One purple Samsung, IMEI: 350957914045684, seized
from TERAIHAROA's person ( "SUBJECT DEVICE 1");



       b.    One white Samsung, IMEI: 353220823510992, seized from BURNS's person ("SUBJECT DEVICE 2"); and



       c.    One black Samsung, IMEI: 354890387738954, seized from BURNS's person ("SUBJECT DEVICE 3").



**ATTACHMENT B**

VIII.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of 21 U.S.C.
§§ 841(a)(1) (Possession with Intent to Distribute Controlled
Substances) and 846 (Conspiracy and Attempt to Distribute
Controlled Substances) (the "Subject Offenses"), from January 1,
2023, to February 2, 2024, namely:

a.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

b.    Records, documents, programs, applications or
materials, ~~or evidence of the absence of same~~, sufficient to     SSC
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or
materials, ~~or evidence of the absence of same~~, sufficient to     SSC
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

i

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.    Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the above-described offenses;

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

2.  Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.  With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.   evidence of the attachment of other devices;

      d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      e.   evidence of the times the device was used;

      f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

      g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      h.   records of or information about Internet Protocol addresses used by the device; and

      i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## IX.   <u>SEARCH PROCEDURE FOR THE SUBJECT DEVICES</u>

5.   In searching the SUBJECT DEVICES or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine

whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**FILED**
CLERK, U.S. DISTRICT COURT

Feb. 3, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ts___ DEPUTY

## FINDING RE PROBABLE CAUSE

On Feb. 3, 2024, at ___2:01___ a/p.m., Agent Andrew Cox of Homeland Security Investigations appeared before me telephonically regarding the probable cause arrest of defendant TEIHOTU TE MATA ONEVANEVA AUGUSTE TERAIHAROA, occurring on or about February 2, 2024, at Los Angeles, California.

Having reviewed the Criminal Complaint and supporting affidavit filed concurrently herewith ~~agent's statement of probable cause, a copy of which is attached hereto~~, the Court finds that there **exists**/~~does not exist~~ probable cause to arrest the defendant for a violation of Title 21, United States Code, Section 841(a)(1).

/__✓__/ It is ordered that defendant TEIHOTU TE MATA ONEVANEVA AUGUSTE TERAIHAROA be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on February 5, 2024_____.

/_____/ It is ordered that defendant TEIHOTU TE MATA ONEVANEVA AUGUSTE TERAIHAROA be discharged from custody on this charge forthwith.

DATED: February 3, 2024___, at ___2:01___ a.m./p.m.

_____
HON. STEPHANIE CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

**FILED**
CLERK, U.S. DISTRICT COURT

Feb. 3, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ts_____ DEPUTY

## FINDING RE PROBABLE CAUSE

On Feb. 3, 2024, at ___2:01___ a./p.m., Agent Andrew Cox of Homeland Security Investigations appeared before me telephonically regarding the probable cause arrest of defendant PIERRE BURNS, occurring on or about February 2, 2024, at Los Angeles, California.

Having reviewed the ~~agent's statement of probable cause, a copy of which~~ Criminal Complaint and supporting affidavit filed concurrently herewith ~~is attached hereto~~, the Court finds that there **exists**/~~does not exist~~ probable cause to arrest the defendant for a violation of Title 21, United States Code, Section 841(a)(1).

/__✓__/ It is ordered that defendant PIERRE BURNS be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on February 5, 2024_____.

/_____/ It is ordered that defendant PIERRE BURNS be discharged from custody on this charge forthwith.

DATED: February 3, 2024, at ___2:01___ a.m./p.m.

_____
HON. STEPHANIE CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE